IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MELISSA METCALF<br>　　Plaintiff, | §<br>§<br>§ | |
| vs. | §<br>§<br>§ | CIVIL ACTION NO. _____ |
| AMERICAN HONDA FINANCE<br>CORPORATION,<br>　　Defendant. | §<br>§<br>§ | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

MELISSA METCALF ("Metcalf"), Plaintiff in the above-entitled and numbered action, files this her Original Complaint and Jury Demand against Defendant AMERICAN HONDA FINANCE CORPORATION, and alleges violations of the Equal Pay Act, as amended, ("EPA"), 29 U.S.C. §206(d). For cause of action, Plaintiff shows the Court as follows:

### I. JURISDICTION & VENUE

1. Metcalf is a resident of Corinth, Denton County, Texas.

2. Defendant is a foreign corporation formed and existing under the laws of the State of California. Defendant may be served with citation in this action by service upon its registered agent for service, CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

3. Defendant is an employer engaged in commerce as that term is defined in 29 U.S.C. §203(d). Defendant is authorized to do business and is doing business in this judicial district.

4. The Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. §1331, 28 U.S.C. §1343(a)(4), and 29 U.S.C. §216(b).

5. All of the acts alleged herein occurred in Dallas County, Texas.

6. Venue exists in this district and division under 28 U.S.C. §1391.

## II. FACTUAL BACKGROUND

7. Metcalf started her employment with Defendant as a contract employee in November of 1994, and then was hired in April of 1995 as a Customer Marketing Representative ("CMR"). Based on her exemplary job performance, it was less than one year that Defendant promoted her to Team Leader in August of 1995. In this position, she supervised five CMRs. One year later, in 1996, Defendant again promoted Metcalf, this time to Staff Manager of Honda Special Services. In this position, Metcalf supervised 15 contract employees that worked in the call center. In 1998, Defendant transferred Metcalf to a Lease Maturity Center ("LMC") CMR Supervisor. This was a Level 18 position in which she supervised 25 CMRs and Team Leaders. One year later, in 1999, Defendant transferred Metcalf to LMC Collections Supervisor. In this position, she supervised 24 Collectors and Team Leaders. In 2001, she was transferred back to LMC CMR Supervisor after returning from maternity leave. In 2002, Metcalf was transferred to the position of Training Supervisor, a position in which she was responsible for the recruitment and training of 245 employees.

8. In 2003, the position of LMC Assistant Manager became open. Metcalf's immediate manager, Harry Thompson, wanted Metcalf for this position. His manager, Stephen Smith, the Senior Vice President Financial Services Division, refused to promote her to this position.

9. Approximately one year later, in 2004, Defendant promoted Metcalf to a regional position as Customer Service Manager. This was a promotion to a Level 21 position. Two years later, Metcalf was transferred to another regional position, Credit Manager. At that time, Metcalf asked for a developmental salary increase that she understood was routinely given to males who

had previously lateraled within a pay grade. Defendant, however, refused to give her this increase, stating that they do not give developmental increases, although there was a procedure for it, and her predecessor, Dean Hardesty, told Metcalf that he had received one.

10. Soon after Metcalf became the Credit Manager, Thompson approached her about her interest in a Remarketing Manager position that had become open. This position would be a promotion with a significant pay increase, as well as car benefits. She was told the job was hers and has documentation that indicates such. As with the prior LMC Assistant Manager position, Smith again refused to approve Metcalf's promotion. At that time, in explaining and apologizing for what had happened, Thompson specifically told Metcalf that Smith was a sexist and does not have trust in women.

11. Months later, the same basic scenario played out. This time, it was in connection with the Cash Management position. This job would have been a promotion with a significant pay increase, as well as car benefits. Once again, despite the fact that Thompson wanted Metcalf for this position with documentation to prove such, Smith refused to allow her to receive that promotion, thereby giving it to a male employee who had been with Defendant only two years as opposed to Metcalf's thirteen.

12. Finally, just two years ago, in 2008, Defendant promoted Metcalf to a Level 31 Bankruptcy Manager. After Metcalf became the Bankruptcy Manager, she attended a meeting with all the managers in which she made a presentation. Although she received compliments from most of the managers concerning the quality of her presentation, Thompson told her that Smith did not like it because "all she likes to do is please people." At that time, Thompson said that the reason for Smith's dislike of her presentation was because "you're just a girl, and Steve has no confidence in women in general because too many women have let him down." He

finished by jokingly stating that was strange coming from someone who was on Defendant's National Diversity Committee.

13. Through conversations with various mentors, including Thompson, Metcalf determined that her route to acquire higher quality jobs in the future would be through a lateral move to a Business Development Manager ("BDM") position. The first BDM position that she expressed interest in was for an opening in Massachusetts this year. Despite the fact that Metcalf was a Level 31 Bankruptcy Manager, the job went to a Level 21 male who had much less tenure than Metcalf. The hiring manager, Don Francy, stated to Thompson that since this was a sales-related position, Metcalf could not adequately perform her position because "being female, she was too soft and the dealers in New York would eat her alive," and "with a working husband and two kids, she couldn't hang with us after hours."

14. In the summer of 2010, another BDM position became available in California. To Metcalf's knowledge, there was never any job posting for the open position. Despite the fact that Defendant was well aware that Metcalf was looking for a BDM position and was willing to relocate, Defendant once again promoted a male with less experience and much less tenure than Metcalf, Paul Kramarz.

15. In July 2010, Ferrell Kemp replaced Harry Thompson as the Senior Manager of the National Service Center. Prior to Thompson retiring, he recommended Metcalf for the National Recovery Center ("NRC") Manager to Kemp. This was a position that carried much more authority than her current position as she would be overseeing a much bigger volume of collections. Significantly, previous NRC Managers were Level 32s. In late July, while Metcalf was on vacation, she found out that she was given the NRC Manager job. Much to her chagrin, however, Kemp said that she would not be a Level 32 because "we downgraded the position." Kemp elaborated further that she would stay at a Level 31 and that they based the decision on

"the person, not the position." During the meeting with Kemp in which she asked why she was not being given a promotion to a Level 32, Kemp looked visibly uncomfortable about Metcalf continuing to question his decision not to give her a Level 32 position with a corresponding increase in salary. To Metcalf's knowledge, all of the previous NRC Managers were male, and all of them were placed at a Level 32, with a corresponding increase in pay to match the higher level job responsibilities that went with the job.

16. Just days after Metcalf's meeting with Kemp in which she specifically questioned why she was not receiving the higher Level 32 position, Kemp questioned Metcalf concerning an expense report that was submitted for approximately $300 for a dinner with five persons present. Even though the expense for this dinner was in keeping with historical practices, Kemp questioned only the fact that Metcalf's Assistant Manager paid for the bill. Metcalf gave her explanation and was told there are no exceptions. She said she understood, as it never happened before and never will happen again. Since Metcalf was unsure about Kemp's philosophy going forward on expenses, she disclosed to him the details of the $300 dinner and drinks, which would have been acceptable under her previous manager. Kemp said that was extravagant and unacceptable under him. She expressed her understanding and was glad that she took the time to get his perspective so that she could alter her actions in the future to better align with his philosophy. Metcalf had assumed that this issue was over. Weeks later, however, Kemp threatened to terminate Metcalf on September 10, 2010 because a lower level employee paid the bill and submitted the expense report, and the expenses tied to the dinner that she disclosed to him for the purpose of future clarification were unacceptable to him. When he told Metcalf that he would not fire her this time, he told her that she needed to decide how much to pay Defendant back for this allegedly inappropriate expense, as well as determine how to make an example of herself and of this alleged "wrongdoing" with her associates. Thus, in order to appease Kemp,

Metcalf wrote a check to Defendant in the amount of $410.90, which represented the full cost of the dinner and drinks and non-related miscellaneous items such as parking and breakfast, as well as emailed the four other associates involved in the event, "apologizing" for her "poor judgment."

17. Ironically enough, after Kemp told Metcalf that she violated policy by allowing a lower level employee to pay for a dinner meeting, as well as expressed his dissatisfaction with her expense control, Kemp did the exact same thing when he paid for a dinner with several senior officials present in which the average price of the dinner was well in excess of the $60 per person that he indicated was unreasonable for Metcalf to have spent. Thus, Kemp violated the same alleged "policy" of spending too much money on a dinner meeting and paying a restaurant bill when he was not the highest-ranking Honda employee present at the dinner. To Metcalf's knowledge, Kemp was not threatened with termination, did not reimburse the Company for any portion of the dinner, and was never told to "apologize" for his "poor judgment."

18. On October 5, 2010, Kemp was holding a meeting with his management team in which he mentioned that HR did not like the "list" because HR was concerned with the risk of such a list, as well as the way we come up with our list. This "list" is used along with pictures of associates to determine movement within the Company. However, Kemp said that upper management will still be using it, but "as far as we are concerned, the list does not exist, and our continued use of it stays confidential." This is the same "list" and the methodology behind it that has kept Metcalf from promoting at the same rate of other male associates within Defendant.

### III. CAUSE OF ACTION

#### A. EQUAL PAY ACT

19. Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 18 as if fully stated herein.

20.  Defendant paid Metcalf unequal compensation based upon her sex in comparison to her male counterparts.

21.  Defendant's actions in paying Metcalf unequal compensation in comparison to her male counterparts was in violation of 29 U.S.C. §206(d)(1) and 29 U.S.C. §215(a)(2). This unequal compensation is a continuing violation of such statutes.

22.  Defendant's actions in paying Metcalf unequal compensation based on her sex were willful and not in good faith, thereby entitling her to liquidated damages pursuant to 29 U.S.C. §216(b).

23.  Metcalf is entitled to receive her attorneys' fees and costs in connection to this lawsuit pursuant to 29 U.S.C. §216(b).

## IV. JURY DEMAND

24.  Metcalf hereby seeks a jury trial of all issues and claims in this case.

## V. PRAYER FOR RELIEF

Wherefore, Plaintiff requests Defendant be cited to appear and answer, and that on final trial, Plaintiff have judgment against Defendant as follows:

1.  actual damages, including lost wages and benefits (both front and back pay);
2.  liquidated damages in the maximum amount allowed by law;
3.  an order that Defendant take such other and further actions as may be necessary to redress Defendant's violation of the Equal Pay Act.
4.  pre-judgment and post-judgment interest at the maximum allowed by law;
5.  attorneys' fees;
6.  costs of suit; and
7.  award such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled.

Dated: December 7, 2010                    Respectfully submitted,

                                      GILLESPIE, ROZEN & WATSKY, P.C.
                                      3402 Oak Grove Avenue, Suite 200
                                      Dallas, Texas  75204
                                      Telephone: 214.720.2009
                                      Telecopier: 214.720.2291


                                  By: _/s/ David K. Watsky_____
                                        David K. Watsky
                                        State Bar No. 20932600
                                        Edith K. Thomas
                                        State Bar No. 24060717

                                  ATTORNEYS FOR PLAINTIFF